# EXHIBIT F



## EMPLOYMENT AGREEMENT

This is an Employment Agreement (hereafter "this Agreement") between **Root Communications Group, L.P.**, a Delaware Partnership authorized to do business in <u>West Point, Georgia and Auburn, Alabama</u> (hereafter "Root"), and <u>John Kennedy</u> (hereafter "Employee").

### Recitals

1. Root is in the business of owning and operating radio stations in the United States (hereafter "Root's Business").

2. Root desires to employ Employee, and Employee desires to work for Root under the terms of this Agreement.

3. At great expense to it, Root has secured accounts and solicited potential accounts through its agents and marketing in various locations in the United States of America. In this regard, Employee will have employment responsibilities involving Account contract, programming and exposure to marketing and/or account information within the broadcast areas of each radio station which Employee is employed for Root (hereafter collectively "Root's Market Area") as defined in Exhibit I. The parties also acknowledge that Root will provide to Employee particularized and extraordinary training relative to Root's Business at considerable time and expense to Root.

4. With the exception of its employees, Root considers their most valuable assets to be their accounts, their sales, financial, marketing and technical information (including account, sales, financial, marketing and technical data, techniques, systems, forms, methods, procedures, and analyses), and any other information, whether communicated orally or in documentary or other tangible form, concerning how Root operates their business. The parties to this Agreement recognize that Root has invested considerable amounts of time and money in attaining and developing all of the information described above (hereafter collectively referred to as "Root's Confidential Information"), and any unauthorized disclosure or release of such confidential information in any form would irreparably harm Root.

5. The parties recognize that Employee may take part in attaining and developing, and/or otherwise will have access to, Root's Confidential Information in the course of Employee's employment with Root.

6. The parties further recognize that protecting Root's Confidential Information from disclosure to others not only benefits Root, but it benefits all of Root's employees who

1

# Exhibit A

## EMPLOYMENT AGREEMENT

remain in Root's employ, as their livelihood is dependent upon the preservation of Root's Business.

In consideration of mutual promises set forth in this Agreement, the parties to this Agreement hereby agree to the following:

### Nature of Employment

7. Root shall employ Employee as a <u>Station Manager/Director of Sales of Root's Auburn, Alabama and West Point, Georgia Radio Stations,</u> the parties acknowledging that the title and duties assigned to Employee may change as Root determines is in its best interest.

### Compensation

8. Root shall pay to Employee compensation in accordance with Exhibit II for **January 1, 2003 – December 31, 2003.**

### Other Simultaneous Employment/Duty of Loyalty

9. Employee will at all times perform the duties required of Employee under this Agreement and devote Employee's exclusive productive time, energy and skill to performing Employee's duties for Root.

10. While in Root's employ, Employee will refrain from engaging in any other business activity, including, without limitation, providing consulting services, without Root's advance written consent, and Employee will promptly notify Root's President of any information Employee learns about any current or former Root employee engaging in any business activity similar or related to Root's Business.

### Root's Information to be Kept Confidential

11. Employee shall refrain from directly or indirectly disclosing to any third party, or using for any purpose other than for the direct benefit of Root, any of Root's Confidential Information during Employee's employment and thereafter, whatever the reason for Employee's leaving Root's employ.

2

## EMPLOYMENT AGREEMENT

### Confidentiality of Root's Property

12. Employee recognizes that all of the documents and other tangible items which contain any of Root's Confidential Information are Root's property exclusively, including those documents and items which Employee may have developed or contributed to developing while in Root's employ, whether or not developed during regular working hours or on Root's premises.

13. Employee recognizes that all materials, identification information, keys, computer software and hardware, manuals, databases, tapes, technical notes and equipment Root provides for Employee are also the property of Root exclusively. All items described in this and the preceding paragraph are hereafter collectively referred to as "Root's Property."

14. Should Employee's employment be terminated for any reason, Employee shall:

   a) Refrain from taking any of Root's Property or allowing any of Root's Property to be taken from Root's premises;

   b) Refrain from reproducing in any manner or allowing to be reproduced any of Root's Property;

   c) Refrain from removing any such reproduction from Root's premises; and

   d) Immediately return to Root at its Philadelphia headquarters any original or reproduction of Root's Property in Employee's possession.

### Non-Compete Covenant

15. Unless Employee receives Root's advance written waiver as described in paragraph 23 below, during Employee's employment with Root and for a period of one (1) year thereafter ("Restrictive Period"); whatever the reason for Employee's termination of employment, Employee shall not, either directly or indirectly, either on Employee's own behalf or on behalf of another business, engage in the following activities, or assist others in such activities, anywhere in Root's Market Area:

   a) Entering into, engaging in, being employed by, being connected to, or consulting for, any radio, television or cable broadcasting facility in a capacity involving duties similar to those performed under this Agreement.

3

## EMPLOYMENT AGREEMENT

b) Soliciting or accepting any broadcast facility advertising business from any of Root's current, former or prospective accounts (a prospective account defined as any entity Root has actively solicited, planned to solicit, or provided services to, during the twelve (12) months before Employee's termination of employment with Root).

c) For a period of one (1) year after Employee's termination of employment with Root for whatever reason, Employee shall not enter the employ of a business which is a current account of Root unless Employee receives Root's advance written consent.

### Non Solicitation – Non Hiring

16. Employee covenants that, during the Restrictive Period, Employee will not knowingly, directly or indirectly, without the consent of Root (i) employ or retain as an independent contractor any Person who, at any time during the twelve-month period ending on the date of termination of the Employee's employment with Root, was employed or retained by Root, or (ii) solicit such Person to terminate such Person's employment or retention by Root for the purpose of becoming employed or retained by Employee or any other Person to perform the same or similar services related to the activities that such Person performed for Root or their successors or assigns.

### Ethical Conduct

17. Employee shall conduct business in an ethical manner by:

a) avoiding conflicts of interest;

b) refusing to accept, and reporting to Root the offering of, anything of value, including a gift, loan on preferential terms, reward, promise of future employment, favor or service which would influence a reasonably prudent person in the discharge of Employee's duties for Root or which is based on any understanding that Employee's action would be influenced; and

c) abiding by policies and guidelines relating to ethical conduct which Root may issue as it deems appropriate.

4

## EMPLOYMENT AGREEMENT

### Remedies for Breach of Agreement

18. The parties to this Agreement recognize that irreparable harm would result from any breach by Employee of the covenants of this Agreement and that monetary damages alone would not provide adequate relief for any such breach. Accordingly, in addition to any other remedy which may be available to Root, if Employee breaches a restrictive covenant in this Agreement, the parties acknowledge that injunctive relief in favor of Root is proper.

19. If Root brings an action to enforce any provision(s) in this Agreement in a court of competent jurisdiction and secures any relief, Employee shall pay to Root all costs and expenses Root incurs in enforcing this Agreement, including Root's court costs and attorney's fees.

20. If Employee breaches a covenant containing a specified term, the term shall be extended by the period of time between Employee's termination of employment with Root and the date a court of competent jurisdiction enters an injunction restraining further breach of the covenant.

21. If Root determines that Employee has breached this Agreement, Employee shall make himself available for service of process within the State of Pennsylvania.

22. If a court of competent jurisdiction determines that any of the restrictions in this Agreement are over broad, Employee shall agree to modification of the affected restriction(s) to permit enforcement to the maximum extent allowed by law.

### Waiver

23. A waiver of any of Employee's obligations under this Agreement or any other modification of this Agreement shall be ineffective unless it is set forth in writing and signed by Root's President.

24. The parties acknowledge that the restrictive covenants in this Agreement are essential independent elements of this Agreement and that but for Employee agreeing to comply with them, Root would not have employed or have continued to employ Employee. Accordingly, the existence of any claim by Employee against Root, whether based on this Agreement or otherwise, shall not operate as a defense to Root's enforcement of any restrictive covenant against Employee.

# EMPLOYMENT AGREEMENT

## Term of Employment

25. This Agreement shall be effective beginning on **January 1, 2003.** Employee's employment under this Agreement shall terminate as set forth below:

    a) At any time for any or no reason, either party may terminate Employee's employment under this Agreement upon 14 day's notice. Root shall have the option of providing pay in lieu of such notice at the rate of Employee's base salary.

    b) Root may terminate Employee's employment under this Agreement immediately without notice for what it determines to be cause, including, but not limited to any breach of this Agreement, violation of a federal, state or local regulation or law, violation of a Root rule or policy, dishonesty, failure to perform work assigned, or poor work performance.

## Assignment

26. Root's rights and obligations under this Agreement shall inure to the benefit of and be binding upon Root's assigns and successors. Since this Agreement is personal to Employee, Employee's obligations under this Agreement may not be assigned or transferred to any other.

## Savings Clause

27. If any provision(s) of this Agreement is declared invalid or unenforceable, the other provisions of this Agreement shall remain in full force and effect and shall be construed in a fashion which gives meaning to all of the other terms of this Agreement.

## Jurisdiction and Venue

28. This Agreement shall be governed by the laws of the State of Pennsylvania, and any action for breach of the terms of this Agreement shall be commenced by a court of

6

FEB-12-2003 12:07  Received 02/12/2003  12:04PM 11:59AM in 05:42 on line [4] for FAXCTR * Pg 20/22
ROOT COMMUNICATIONS                                    6106604933      P.20

## EMPLOYMENT AGREEMENT

competent jurisdiction within Montgomery County, Pennsylvania where jurisdiction and venue shall lie.

### Incorporation

29. This Agreement expressly supersedes all practices, understandings, and agreements, whether written or oral, not specifically set forth in this Agreement. This Agreement constitutes the entire Agreement between Root and Employee, and there are no other Agreements or understandings concerning this Agreement which are not fully set forth in this Agreement.

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement at _____ on the 22 day of _____ 2001.

Root Communications Group, L.P.
Root Communications, Inc.,
Its Managing General Partner

Witness

Daniel C. Savadove, CEO

Witness

EMPLOYEE

7

PAGE 20/22 * RCVD AT 2/12/2003 11:59:01 AM [Eastern Standard Time] * SVR:/4 * DNIS:1307 * CSID:6106604933 * DURATION (mm-ss):05-42

**EXHIBIT I**

**"Root's Market Area"**

Root's Market Area shall be defined as the West Point, Georgia market, and the Auburn, Alabama market and shall include: (1) any FM station whose 1 mV/m signal pattern overlaps the 1 mV/m signal pattern for any Root owned FM station or the .5 mV/m signal pattern of any Root owned AM station serving the West Point, Georgia, or the Auburn, Alabama market; and (2) any AM station whose .5 mV/m signal pattern overlaps the 1 mV/m signal pattern of any Root owned FM station or the .5 mV/m signal pattern of any Root owned AM station serving the West Point, Georgia market or the Auburn, Alabama market.

Root's Market Area shall include the broadcast market area of Radio Stations WPLV and WCJM, West Point, Georgia and the broadcast market area of Radio Stations WMXA, WKKR, WZMG, and WTLM, Auburn, Alabama.

1

## EXHIBIT II

### Station Manager/Director of Sales

Root desires to provide an incentive to the Employee to increase the revenue and cash flow of Root's Market Area for the period beginning **January 1, 2003** and ending **December 31, 2003.**

### 1. Compensation

    a. **Salary** – Root shall pay the Employee a base salary at the rate of **$48,000** per year.

    b. **Monthly Override** – Root shall pay the Employee a monthly override at .3% or .5% or 1.1% or 1.2% or 1.3 or 1.4% of total net operating revenues, less sales adjustments and collection chargebacks for WPLV, WCJM, WKKR, WMXA, WZMG, and WTLM as determined by Root's Chief Financial Officer and pursuant to the below chart based on percent of achievement of Root's market area budget.

| Percentage of Monthly Budget Achieved | % of Net Monthly Revenues Paid as Monthly Override |
|---|---|
| 99 and below | .3 |
| or 100-109 | .5 |
| or 110-119 | 1.1 |
| or 120-129 | 1.2 |
| or 130-149 | 1.3 |
| or 150 and above | 1.4 |

The override will be paid within thirty (30) days from month end in accordance with generally accepted business practices.

    c. **Quarterly Bonus** – – Root shall pay the Employee a bonus determined pursuant to the below chart based on percent of achievement of Root's Market Area budgeted net operating earnings (Quarterly Broadcast Cash Flow) before corporate allocation, depreciation and amortization, as determined by Root's Chief Financial Officer for

1

each quarter ending during the compensation years. The bonus will be paid as soon as administratively feasible as determined by Root's Chief Financial Officer.

> Percentage of Achievement

| Quarterly Broadcast Cash Flow | Bonus |
|---|---|
| 120 & above | $1,000 |
| 110-119 | $500 |
| 100-109 | $250 |
| 99 and below | $0 |

    **d. Annual Bonus** – For Root's fiscal year 2003 (January 1, 2003 – December 31, 2003), Root shall pay the Employee 7.5¢ on every dollar above Root's Market Area Annual Broadcast Cash flow budget (Annual net earnings before Corporate Depreciation and Amortization as determined by Root's Chief Financial Officer for each fiscal year.) The bonus will be paid in April of the following year after Root's audited financial statements are available as determined by Root's Chief Financial Officer.

    **e. Earnings Calculations for purposes of paragraphs 1(c) and 1(d)** – Broadcast Cash Flow is generally defined as net revenues less all station expenses before interest, federal taxes, depreciation & amortization, and corporate allocation and adjusting for the net of trade income and expense. Additionally, Root may exclude or include certain revenue or expense items from the above Broadcast Cash Flow definition so long as the exclusions/inclusions are set forth in writing to the Employee.

    **f. Monthly Override and Bonus Eligibility** – In order for the Employee to be eligible for any payments due under Paragraphs 1(b), 1(c) and 1(d) the employee must meet the objectives set forth in Paragraphs 1(b), 1(c) and 1(d) and be employed by Root on the first and last days of any applicable month or quarter or fiscal year respectively.

2.    **Health Insurance** – Root shall allow Employee participation in Root's health insurance plan on the same terms as generally provided to Root's other employee's.

3.    **Vacation** - Employee is entitled to personal time off (PTO days) as stated in the Personnel Policy Manual and to be used and accrued in accordance with the Root Company Policy.

4.    **Cellular Phone**– Root shall either reimburse Employee up to $60 monthly or allow Employee to trade for up to $60 monthly for the cost of Employee's business related cellular use.

2

5. **401K-** Employee will be eligible to participate in the Company's 401K plan subject to the provisions of the plan.

6. **Employee will be responsible for,** and Root will withhold, any associated federal or state income taxes due on automobile, temporary housing and or moving allowance in accordance with any/all applicable federal, state, or local tax laws.

3

**EXHIBIT G**



# CORPORATE DETAILS
### Office of the Secretary of State
### State of Alabama

## INITIATE NEW BROWSE

Company                                                      ELL 605-444
  Legal Name:   Qantum Acquisition Company, ILC

State Of Reg:   Delaware

Reg Date. . . :   06-23-2003

Formed Date.:   02-28-2003

Reg Agent . . :   CSC-LAWYERS INCORPORATING SVC INC
                  150 S PERRY ST
                  MONTGOMERY, AL   36104

Prin Address:   3 STAMFORD LANDING   STE 210
                  46 SOUTHFIELD AVE
                  STAMFORD, CT   06902

Nat Of Bus . :   OPERATION OF RADIO STATIONS

## ← PREVIOUS PAGE



© 2005  Office of the Secretary of State, State of Alabama

# CORPORATE DETAILS
### Office of the Secretary of State
### State of Alabama

INITIATE NEW BROWSE

Company                                          ELL 605-374
  Legal Name:   Qantum of Auburn, LLC

State Of Reg:   Delaware

Reg Date....:   06-04-2003

Formed Date.:   05-09-2003

Reg Agent...:   CSC-LAWYERS INCORPORATING SVC INC
                150 S PERRY ST
                MONTGOMERY, AL  36104

Prin Address:   3 STAMFORD LANDING  STE 210
                46 SOUTHFIELD AVE
                STAMFORD, CT  06902

Nat Of Bus..:   OPERATION OF RADIO STATIONS

← PREVIOUS PAGE



© 2005, Office of the Secretary of State, State of Alabama

**EXHIBIT H**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

QANTUM COMMUNICATIONS,       )
CORPORATION, *et al.,*        )
                             )
    Plaintiffs,              )
                             )
v.                           )   CIVIL ACTION NO. 3:04cv118-C
                             )          (Lead Case)
STACEY LINN,                 )
MEGHAN CHENOWETH,            )   [CIVIL ACTION NO. 3:04cv119-C]
AMELIA TUCK TURNER,          )   [CIVIL ACTION NO. 3:04cv191-C]
                             )
    Defendants.              )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

On February 12, 2004, Qantum Communications Corporation, Qantum of Auburn, LLC, Qantum Acquisition Company, LLC, Qantum Holding, LLC, and Qantum of Auburn License Company, LLC (collectively referred to as "Qantum"), filed these breach of contract cases against defendants Stacey Linn ("Linn") and Meghan Chenoweth-Jeffcoat[1] ("Chenoweth") alleging that the defendants had violated and were continuing to violate valid Non-Compete Agreements. Qantum subsequently sued Amelia Tuck Turner ("Turner") for her alleged violation of the Non-Compete Agreement as well as Tiger Communications ("Tiger") for intentional interference with business and contractual relationship. On May 11, 2004, the court consolidated these cases for all pretrial proceedings. (Doc. # 14).

Qantum owns and operates several radio stations in the Auburn/Opelika area in

---

[1] Mrs. Chenoweth-Jeffcoat married after she left her employment with Qantum. For simplicity's sake, the court will refer to her as Chenoweth.

Alabama  Linn, Chenoweth and Turner were salespersons for Qantum, selling advertising on Qantum's radio stations.  All three women signed non-compete agreements in which they agreed to

> not, either directly or indirectly, either on his/her own behalf or own behalf of another business, engage in the following activities, or assist others in such activities, anywhere in Root's[2] Market Area:
>
>> a)    hire, recruit, or attempt to recruit, for any radio station, any person employed by Root at any time during the previous twelve (12) months;
>>
>> b)    solicit or accept any radio advertising business from any of Root's current, former or prospective accounts (a prospective account is defined as any entity Root has actively solicited, planned to solicit, or sold advertising time to during the twelve (12) months before Employee's termination of employment with Root); or
>>
>> c)    enter into, engage in, be employed by, be connected to or consult for any radio station business within Root's Market Area.

(Pls' Ex. A, Pls' Ex. 6.)

The market area at stake is defined in the non-compete agreements as a 75-mile radius, and the non-compete agreements restrict employment for periods of six-months.  In December 2003, Chenoweth resigned her employment with Qantum.  (Chenoweth Dep. at 7.)  Linn left her employment with Qantum in January 2004, (Linn Dep. at 4), and Turner resigned her position with Qantum on February 23, 2004.  (Turner Dep. at 4.)  According to Qantum, Tiger subsequently hired Chenoweth, Linn and Turner within the six-month period contemplated by and in violation of their non-compete agreements.

---

[2]  It is undisputed that Root was subsequently purchased by Qantum, and the non-compete agreements are applicable to Qantum.  The parties dispute whether the non-compete agreements are enforceable but for the purpose of the motions to dismiss, the court assumes that they are valid and enforceable.

Qantum premises this court's jurisdiction solely on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332. This court has jurisdiction over actions involving citizens of different states provided that, all plaintiffs are diverse from all defendants, *see Strawbridge v. Curtiss*, 7 U.S. 267 (1806), and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(b). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

Now pending before the court is defendant Linn's motion to dismiss (doc. # 4); defendant Chenoweth's motion to dismiss (doc. # 4); and defendant Turner's motion to dismiss (doc. # 4).[3] Qantum asserts that there is complete diversity between the parties and the amounts in controversy exceed $75,000. *See* 28 U.S.C. § 1332. The defendants, however, contend that the court does not have subject matter jurisdiction because the amount in controversy as to each individual defendant does not exceed $75,000.[4] After careful review and consideration of the motions to dismiss (docs. # 4), Qantum's responses, the briefs and evidentiary material filed in support of and in opposition to the motions, the court concludes that because it does not have subject-matter jurisdiction over defendants Chenoweth, Linn and Turner, their motions to dismiss are due to be granted, and their cases

---

[3] Also pending are Qantum' motion for preliminary injunction (doc. # 12) and motion for Partial Summary Judgment (doc. # 20). However, because the court does not have subject matter jurisdiction over these cases, the court cannot decide these motions.

[4] Defendant Tiger did not file a motion to dismiss in the case filed against it. *See Qantum Communications Corp., et al v. Tiger Communications, Inc.*, CV 3:04cv190-CSC (M.D. Ala. 2004). Because Tiger did not file a motion to dismiss, that case will proceed.

3

are due to be dismissed.

## II. DISCUSSION

### A. The Law Generally

There is no dispute that there is diversity of citizenship between the parties in this case. The only dispute at this juncture is whether the amount in controversy against each defendant exceeds $75,000. In examining the issue of jurisdiction, the court is mindful that federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (1994). Because federal courts are courts of limited jurisdiction, they only have the power to hear cases as authorized by the Constitution or the laws of the United States, *see Kokkonen*, 511 U.S. at 377, and are required to inquire into their jurisdiction at the earliest possible point in the proceeding. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

FED. R. CIV. P. 12(h)(3) requires that "[w]herever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction, the court shall dismiss the action." Every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based. This obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issues and both parties are prepared to concede it. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990). In cases in which jurisdiction is premised on diversity, the court is "obligated to assure itself that the case involves the requisite amount in controversy." *Morrison v. Allstate Indem. Co.*, 228 F.3d

4

1255, 1261 (11th Cir. 2000).

## B. The Burden of Proof

The defendants assert that because Qantum has requested an unspecified amount of damages, it bears the burden of establishing, by a preponderance of the evidence, that damages meet or exceed the requisite statutory amount. Qantum asseverates that unless it appears to a legal certainty that it cannot, in good faith, claim the jurisdictional amount, the defendants' motions to dismiss should be denied.[5] Qantum's requests for damages are for unspecified amounts. In the three complaints, Qantum repeatedly seeks damages in "an amount to exceed $75,000, exclusive of interest and costs." *See Compl.*, ¶ 5, at 2; ¶ 20 at 6; Section V, at 7. Qantum is the master of its complaints and its requests for damages are clearly for an indeterminate amount. *See Morrison*, 228 F.3d at 1261. Because Qantum seeks unspecified amounts of damages in each complaint, it bears the burden of proving, by a preponderance of the evidence, that its claims meet the requisite jurisdictional amount for each defendant.

> Generally, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *[St. Paul Mercury Indem. Co. v.] Red Cab Co.*, 303 U.S. at 289, 58 S.Ct. at 590. However, where jurisdiction is based on a claim for indeterminate damages, the *Red Cab Co.* "legal certainty" test gives way, and the party seeking to invoke federal jurisdiction bears the burden of proving by a preponderance of the evidence that the claim on which it is basing jurisdiction meets the jurisdictional minimum.

---

[5] Qantum' reliance on *Zimmer-Hatfield, Inc. v. Wolf*, 843 F. Supp. 1089 (S.D. W.Va. 1994) is misplaced. As a district court, its decision is merely persuasive and not binding on this court. Furthermore, the West Virginia district court did not apply or consider Alabama law to determine the appropriate measure of damages for a breach of a non-compete agreement.

5

*Fed. Mut. Ins. Co. v. McKinnon Motors, L.L.C.*, 329 F.3d 805, 807 (11th Cir. 2003).

## C. The Motions to Dismiss

The court next turns to the defendants' motions to dismiss. Each defendant premises her motion to dismiss on the lack of subject matter jurisdiction. According to the defendants, the amount in controversy does not exceed $75,000[6] and thus, this court does not have jurisdiction over these claims.[7]

Assuming the non-compete agreements are valid and enforceable,[8] Qantum contends that the appropriate measure of damages for the purpose of establishing the amount in controversy is Qantum's loss of gross sales revenue, the reduction in the overall value of the enterprise and the loss of account customers. Qantum does not provide any support of the assertion that this is the correct measure of damages in this case. The defendants, on the other hand, assert that the correct measure of damages for a breach of a non-compete agreement is set forth in *Corson v. Universal Door Sys., Inc.*, 596 S. 2d 565 (Ala. 1992).

A federal court sitting in diversity applies state substantive law and federal procedural law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). Under Alabama law, "[t]he correct

---

[6] The law is clear that the claims against each defendant must meet the jurisdictional minimum individually. *See Zahn v. International Paper Co.*, 414 U.S. 291, 295 (1973) ("When two or more plaintiffs, having *separate and distinct* demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount.")

[7] The defendants also assert that none of the plaintiffs are FCC licensees and thus, have no standing to bring these actions. Because the court concludes that Qantum's claims do not meet the jurisdictional minimum amount in controversy, it pretermits discussion and resolution of this issue.

[8] The court need not resolve this issue because even if the agreements are valid and enforceable, Qantum has failed to demonstrate, by a preponderance of the evidence, that damages exceed the jurisdictional minimum.

measure of damages is the amount of the loss suffered by [the plaintiff] due to [the defendant's] breach." *Corson*, 596 So. 2d at 571. *See also Clark v. Liberty Nat'l Life Ins. Co.*, 592 So. 2d 564, 567 (Ala. 1992); *James S. Kemper & Co. S.E. v. Cox & Assocs., Inc.*, 434 So. 2d 1380, 1386 (Ala. 1983). In addition, "[o]nly if [the plaintiff] had an exclusive relationship with a customer is it reasonably inferable, in the absence of other evidence, that any revenue . . . would have gone to [the plaintiff]." *Corson*, 596 So. 2d at 571. Absent an exclusive relationship with customers, the defendants can be liable only for any damages arising from loss of business that they "directly or indirectly, diverted from" Qantum. *Id.*, at 570.

Even by the most generous of calculations, Qantum has failed to demonstrate by a preponderance of the evidence that any of defendants diverted more than $75,000 worth of business from Qantum to Tiger during the six-month period encompassed within the non-compete agreements. By its own admission, Qantum's lost advertising revenues from Linn and Turner's departures are far below the statutory jurisdictional minimum. Scott Bebout, Qantum's marketing director, testified that, *over the course of one year*, Qantum lost $19,736.00 in advertising from Linn's clients and $42,079.00 in advertising from Turner's clients.[9] (Bebout Dep. at 35 & 47). Clearly, Qantum's claims for damages against Linn and Turner do not exceed $75,000. Linn and Turner's motions to dismiss are due to be granted.

Bebout further testified that he calculated Qantum's lost revenue profits from

---

[9] The defendants dispute the accuracy of these figures. However, the court need not resolve this dispute because even taking the figures as asserted by Qantum, they do not meet the jurisdictional minimum.

Chenoweth's clients at $88,168.00  (*Id.* at 7)  Bebout reached this figure by looking at
Chenoweth's clients who reduced or cancelled their advertising with Qantum.  (*Id.* at 9).  He
conceded, however, that he then added "some dollar value" for her experience and expertise.
(*Id.*)

   In determining damages for a breach of a non-compete agreement, the court looks to
those clients who left or diminished their advertising revenue on Qantum and advertised on
Tiger during the six-month period the non-compete agreement was in force.  *Clark,* 592 So.
2d at 567.  *See also James S. Kempler & Co. Southeast,* 434 So. at 1385.  A review of
Chenoweth's Qantum clients who cancelled or reduced their advertising on Qantum and
subsequently advertized on Tiger demonstrates, at best, lost revenues in the amount of
$41,424.00.[10]  Even if the court were to examine the accounts of all of Chenoweth's clients
who advertised on Qantum in 2003 and 2004 without regard to whether those clients
advertised on Tiger, the amount of lost revenue would still fall far short of the jurisdictional
minimum.  The difference in advertising revenue to Qantum from all of Chenoweth's clients
in 2003 and 2004 amounts to only $61,068.00.  Consequently, even by the most liberal
calculations, Qantum has failed to demonstrate that the amount of damages caused by

---

[10]  To reach this calculation, the court considered the following figures:

| | |
|---|---|
| Auburn Alehouse | Loss of $2800 |
| Buffalo's American Grill | Loss of $8161 |
| J & M Bookstore | Loss of $5248 |
| King Ford | Loss of $12769 |
| Niffers Place | Loss of $2072 |
| Southern Union | Loss of $3579 |
| Unwired | Loss of $6795 |

Chenoweth's defection to Tiger exceeds $75,000.00.

The sum total lost revenue for each defendant falls significantly short of the requisite $75,000 amount in controversy. In addition, none of the figures take into consideration that some of the defendants' clients continued to advertise on Qantum, albeit spending less advertising dollars. Moreover, at least six clients increased their advertising spending at Qantum after these defendants left Qantum to join Tiger. Finally, Qantum assumes that all advertising dollars spent at Tiger would have been spent at Qantum which, of course, is purely speculative. It is undisputed that many of the defendants' clients advertised with both Qantum and Tiger. (Chenoweth Dep. at 16).

While Qantum would be entitled to nominal damages for any breaches of the non-compete agreements by merely showing that Chenoweth, Linn or Turner solicited a Qantum customer, in order to be entitled to more, Qantum must demonstrate that but for the defendants' breaches, it would have gotten the business that went to Tiger. *See Corlson*, 596 So. 2d at 570. Qantum has presented no evidence to meet this burden. Consequently, Qantum failed to demonstrate, by a preponderance of the evidence, that for jurisdictional amount purposes, it would be entitled to anything more than nominal damages.

Qantum argues, however, that damages ought to be determined by estimating by the total amount of monthly sales revenue it contends each defendant would have brought in and then multiplying that figure by six – for each month the non-compete agreements were in force. (Pls' Supp. Br. in further Opp. to the Ind. Defs' Mots. to Dismiss, at 12-14). Thus, Qantum estimates its loss sales revenue in the amount of $125,172.00 for Chenoweth's

9

defection, $90,000.00 from Linn's defection and $120,000.00 due to Turner's defection. (*Id.* at 14) Furthermore, according to Qantum, Chenoweth's testimony that Tiger had 1.1 million dollars in sales revenue in a six-month period clearly establishes that Qantum's damages would exceed the jurisdictional minimum. (*Id.* at 15-18)

The problems with Qantum's calculations are manifest. First, the calculations are hypothetical and speculative. For example, Bebout admitted that Linn did not average $15,000 per month in revenue when she was with Qantum. (Bebout Dep. at 42-43). He also testified that in calculating Qantum's lost sales revenues, he added "some dollar value" to compensate for each of the defendants' experience. (*Id.* at 8-9). Thus, it appears that Qantum's calculations of lost revenue and damages are based on purely speculative and hypothetical data. Qantum must present sufficient evidence of damages "to allow the factfinder to calculate the damages without operating from guesswork." *Clark*, 592 So. 2d at 567.

More importantly, the estimates simply calculate the wrong measure of damages. At a minimum, the court considers Qantum's lost revenue from each of the defendant's Qantum clients who subsequently advertised on Tiger. *See Corson*, 596 So. 2d at 571. However, this is merely a starting point. There are other facts to consider in determining whether business was diverted from Qantum to Tiger and whether the diversion was caused by reasons other than these defendants' efforts. *Id.*, at 570. Bebout admitted that there are many reasons why a client would cancel or reduce advertising at a particular radio station including change in ratings, change in format, change in programming, change in ownership, change in

10

budgeting, and change in management (Bebout Dep. at 21). None of these factors are considered in Qantum's calculations. Finally, because Qantum offered no evidence of an exclusive relationship with any of the advertisers, the court cannot, absent any other evidence, simply infer that any revenue that went to Tiger would have instead gone to Qantum. *See Corlson*, 596 So. 2d at 571. "Jurisdiction is based on actuality, not prophecy, the pressure of a grievance immediately felt and presently measurable in money of the jurisdictional amount." *Morrison*, 228 F.3d at 1270.

The court concludes that Qantum has failed to demonstrate, by a preponderance of the evidence, that the amount in controversy for each defendant exceeds $75,000. Thus, the court lacks subject matter jurisdiction to review the claims raised in Qantum's complaints against Stacey Linn, CV3:04cv118, Meghan Chenoweth-Jeffcoat, CV3:04cv119, and Amelia Tuck Turner, CV3:04cv191, because diversity jurisdiction is lacking in these cases. *See* 28 U.S.C. § 1332(a).

## V. CONCLUSION

Accordingly, it is

ORDERED as follows:

1. Defendant Linn's motion to dismiss in CV3:04cv118-CSC be and is hereby GRANTED.

2. Defendant Chenoweth-Jeffcoat's motion to dismiss in CV 3:04cv119-CSC be and is hereby GRANTED.

3. Defendant Turner's motion to dismiss in CV 3:04cv191-CSC be and is hereby

11

GRANTED.

Separate final judgment orders will be entered dismissing each of these cases.

Done this 14th day of March, 2005.

         /s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE